UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER CHARON,<br><br>*Plaintiff*,<br><br>v.<br><br>ANASAZI GROUP LLC, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-430 (SLS)<br><br>Judge Sparkle L. Sooknanan |

## **MEMORANDUM OPINION**

Christopher Charon worked at the Graham Georgetown Hotel for seven months before he was fired. He brought this suit against his former employer and its parent company in the Superior Court of the District of Columbia, alleging a hostile work environment, discriminatory termination, and retaliation in violation of the District of Columbia Human Rights Act (DCHRA). The Defendants removed the case to this Court, and they now move to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the Court grants the motion in part and denies it in part. Although the Court dismisses Mr. Charon's hostile work environment and discriminatory termination claims, his retaliation claim survives dismissal.

## BACKGROUND

### A. Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Mr. Charon was hired as the Operations Manager at the Graham Georgetown Hotel in October 2023. Compl. ¶ 8, ECF No. 1-1. Mr. Charon is a veteran who suffers from anxiety as a result of his previous military service. Compl. ¶ 9. Mr. Charon is also openly gay. Compl. ¶ 14.

During his time at the hotel, there was one other openly gay employee, Brand Kidney. Compl. ¶¶ 13–14.

From the start of his employment at the Graham Georgetown, Mr. Charon "experienced hostility through email correspondence with [the] Defendants' Human Resources representative, Monique McIntyre, and Financial Controller, Moore Dolue." Compl. ¶ 10. This hostility included "mishandling 401K deductions, blaming [Mr. Charon] for errors that were not his fault, and delaying reimbursement of expenses." Compl. ¶ 11.

In March 2024, roughly five months into Mr. Charon's tenure, the situation deteriorated further. On March 11, 2024, Mr. Dolue "falsely accused [Mr. Charon] of stealing Three Hundred Dollars ($300.00) from a safe on the premises." Compl. ¶ 12. Then, on March 23, 2024, Mr. Kidney, the other openly gay employee at the Graham Georgetown, requested a password reset code for his account from Mr. Dolue. Compl. ¶ 13. Mr. Dolue responded by sending Mr. Kidney a reset code consisting of the "derogatory term for homosexual people, 'fag,' followed by Mr. Kidney's employee number." *Id.* Mr. Kidney told Mr. Charon about the reset code and forwarded him Mr. Dolue's email. Compl. ¶ 15. Roughly one week later, Mr. Charon reported the incident to Bryan Friedman, the owner of the Graham Georgetown. Compl. ¶ 16. Mr. Friedman just "laughed" in response. *Id.* Mr. Friedman did not initiate an investigation of the incident or take any corrective action. *Id.*

Not long after this incident, on April 4, 2024, Mr. Charon slipped and fell on a wet floor on the hotel premises. Compl. ¶ 17. He suffered a "serious injury to his right leg, which required multiple surgeries and lengthy rehabilitation." *Id.* Mr. Charon was unable to walk for approximately six months due to the injury and was permitted to "primarily work from home" "as an accommodation for his disability." Compl. ¶¶ 17, 19.

Following his fall, Mr. Charon requested documentation to submit a worker's compensation claim. Compl. ¶ 20. On April 12 and April 15, 2025, he requested an incident report for the slip and fall from the Human Resources representative, Ms. McIntyre, but received no response. Compl. ¶¶ 21–22. Mr. Charon did, however, begin to receive emails from the hotel's General Counsel, Stephanie Zimmerman. Compl. ¶ 23. As the two corresponded, Ms. Zimmerman's messages grew increasingly "hostile" and "unprofessional" and "insinuate[ed] that [Mr. Charon] was not being honest about the wet floor causing [his] fall." *Id.* In response to Ms. Zimmerman's hostility, Mr. Charon requested that she "cease emailing him due to his service-connected anxiety." Compl. ¶ 24. Despite that request, Ms. Zimmerman later sent a "lengthy email condemning [Mr. Charon's] co-workers who assisted [him] in . . . recording his recollection of the slip and fall . . . [and] in getting information on the company's worker's compensation process." Compl. ¶ 25. Ms. Zimmerman also stated: "There will be reprisals for everyone involved[.]" Compl. ¶ 26. The co-workers who had assisted Mr. Charon—Alexis Smith and Anton Mueller—later told him that Ms. Zimmerman had "aggressively interrogated" and threatened them with corrective action or termination. Compl. ¶¶ 27–28.

On May 9, 2024, Mr. Charon was terminated and told that his position was being eliminated "due to a restructuring" and the addition of a "new manager of the company." Compl. ¶¶ 29–30. The Operations Manager at the Graham Georgetown's "sister" property was not eliminated as part of the restructuring. Compl. ¶ 30. At the time of his termination, Mr. Charon "had been doing his work at a satisfactory level and was able to perform the essential duties of his position with a reasonable accommodation." Compl. ¶ 61. Mr. Miller and Ms. Smith "were terminated on May 9, 2024 and May 13, 2024, respectively." Compl. ¶ 31.

### B.     Procedural Background

On January 2, 2025, Mr. Charon filed this lawsuit in the Superior Court of the District of Columbia, alleging the Defendants violated the DCHRA, D.C. Code § 2-1401.01, *et seq.*, by subjecting him to a hostile work environment based on his sexual orientation and disability (Counts I and II), wrongfully terminating him based on disability (Count III), and retaliating against him for engaging in protected activity (Count IV). Compl., ECF No. 1-1. On February 13, 2025, the Defendants removed the case to federal court. Notice of Removal, ECF No. 1. On March 31, 2025, the Defendants moved to dismiss Mr. Charon's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defs.' Mot. Dismiss, ECF No. 7. The motion is fully briefed and ripe for review. *See* Pl.'s Opp'n, ECF No. 8; Defs.' Reply, ECF No. 9.

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010). "In evaluating a motion to dismiss under Rule 12(b)(6), the court must 'treat the complaint's factual allegations as true . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Donelson v. U.S. Bureau of Prisons*, 82 F. Supp. 3d 367, 370 (D.D.C. 2015) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up)). But the court need not accept a plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). "[T]he court 'may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which . . . judicial notice' may be taken." *Donelson*, 82 F. Supp. 3d at 371 (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

**DISCUSSION**

The Defendants argue that all four of Mr. Charon's claims should be dismissed under Rule 12(b)(6). The Court agrees that Mr. Charon's hostile work environment and discriminatory termination claims must be dismissed but finds that Mr. Charon has plausibly alleged retaliation. Accordingly, that claim survives dismissal at this early stage.

**A.    Hostile Work Environment (Counts I and II)**

The DCHRA prohibits employers in the District of Columbia from discriminating based on sexual orientation or disability in hiring, firing, compensation, or other terms and conditions of employment. *See* D.C. Code § 2-1402.11(a).[1] This means that employers may not require "people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Mr. Charon alleges that the Defendants subjected him to a hostile work environment because he is gay, Compl. ¶¶ 34–42, and, separately, because he has a disability, Compl. ¶¶ 43–54. Neither claim is sufficiently pleaded to survive dismissal.

To adequately plead a hostile work environment claim, a plaintiff must plausibly allege that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) he was harassed because of his protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of his employment; and (5) the employer knew or should

---

[1] In addressing employment discrimination claims brought under the DCHRA, "courts look to the jurisprudence surrounding Title VII of the Civil Rights Act of 1964." *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 122 (D.D.C. 2011); *see also Johnson v. Dong Moon Joo*, No. 01-CV-0004, 2006 WL 627154, at *19 (D.D.C. Mar. 12, 2006) (using the Title VII framework as "a short-hand reference" when analyzing claims brought under the DCHRA). *But see District of Columbia v. Bryant*, 307 A.3d 443, 456 (D.C.), *reh'g denied* (Sept. 27, 2024) (declining "to follow the Supreme Court's approach to Title VII retaliation claims when determining what standard to apply to DCHRA retaliation claims"). Here, the Parties do not dispute that Title VII's standards generally apply to the Plaintiff's DCHRA claims. Defs.' Mot. Dismiss at 5 n.4, ECF No. 7-1; Pl.'s Opp'n at 10, ECF No. 8-1.

have known about the harassment but nonetheless failed to take steps to prevent it. *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012); *see also Kartte v. Davis*, No. 21-CV-3310, 2022 WL 1442789, at *5–6 (D.D.C. May 6, 2022).

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). The Supreme Court has also made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher*, 524 U.S. at 788). By adhering to these standards, a court "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace[.]" *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted).

Starting with Mr. Charon's hostile work environment claim based on sexual orientation, he is plainly a member of a protected class. Compl. ¶ 14. He has also adequately alleged that the email sent by Mr. Dolue to Mr. Kidney with the derogatory term for homosexuals was harassing and discriminatory, and that the owner of the Graham Georgetown learned about the email and did nothing about it. Compl. ¶¶ 13–16.

The problem for Mr. Charon is that this single email is not conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21. The use of the term in question is undeniably offensive. But as the Supreme Court has previously explained, the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.*

6

(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (cleaned up). The same is true under the DCHRA. And it is even more true here where the offensive utterance in question was not specifically directed at Mr. Charon and was delivered via email rather than in person. *See Lester v. Natsios*, 290 F. Supp. 2d 11, 31–32 (D.D.C. 2003) (a "highly derogatory letter" referring to the Ku Klux Klan "left on the desk of several African-American employees" but not the plaintiff's desk was "plainly serious and extremely offensive" but was insufficient on its own to create an abusive working environment); *see also Kartte*, 2022 WL 1442789 at *6 ("undeniably unpleasant" text messages and emails that the defendant sent directly to the plaintiff did "not rise to the level of a hostile work environment" and "would likely be more offensive to hear face to face").

The cases cited by Mr. Charon only highlight the paucity of his allegations. *See* Pl.'s Opp'n at 6–8. In *Yazzie v. National Organization for Women*, the plaintiff alleged "more than a single instance of verbal abuse," including that she was physically grabbed and pushed, locked out of her office, excluded from meetings, and prevented from interacting with other employees. 712 F. Supp. 3d 56, 88 (D.D.C 2024). And the plaintiff in *Ayissi-Etoh v. Fannie Mae* similarly alleged multiple incidents of harassment, including that his direct supervisor used a "deeply offensive racial epithet when yelling at Ayissi-Etoh to get out of the office." 712 F.3d 572, 577 (D.C. Cir. 2013). While the D.C. Circuit found that the latter incident "might well have been sufficient to establish a hostile work environment," *id.*, that incident was much more severe than Mr. Dolue's email, which was sent to someone other than Mr. Charon and contained a written slur rather than one delivered face to face. *See Lester*, 290 F. Supp. 2d at 31; *Kartte*, 2022 WL 1442789 at *6.

Finally, to the extent Mr. Charon seeks to rely on more general allegations of mistreatment to support his hostile work environment claim—*e.g.*, that his 401K deductions were mishandled,

7

that he was blamed for errors that were not his fault, or that he was falsely accused of stealing $300, Compl. ¶¶ 11–12—he does not sufficiently allege a "causal connection" between any of this alleged mistreatment and his sexual orientation. *Peters*, 873 F. Supp. 2d at 188–89 ("the plaintiff must always prove that the conduct at issue was not merely tinged with offensive connotations, but actually constituted discrimination because of the employee's protected status") (cleaned up).

Mr. Charon's hostile work environment claim based on disability fares no better. At bottom, this claim hinges on Mr. Charon's email exchanges with Ms. Zimmerman after his fall. But Mr. Charon's allegations do not provide a sufficient basis to infer that Ms. Zimmerman was "hostile," "unprofessional," or distrusting of Mr. Charon *because* of his disability. Compl. ¶ 23; *see Peters*, 873 F. Supp. 2d at 188–89. Even if they did, Ms. Zimmerman's behavior towards Mr. Charon was not so "extreme" as to have changed the "terms and conditions" of Mr. Charon's employment. *George*, 407 F.3d at 416. While Mr. Charon might well convince a jury that Ms. Zimmerman's behavior was uncivil, the DCHRA (like Title VII) is not "a general civility code." *Faragher*, 524 U.S. at 788. Moreover, the fact that Mr. Charon was permitted to work from home after his fall "as an accommodation for his disability," Compl. ¶ 19, undercuts his argument that the other alleged mistreatment he endured from hotel management was motivated by anti-disability bias or was "sufficiently severe or pervasive to . . . create an abusive working environment." *Harris*, 510 U.S. at 21.

### B.   Discriminatory Termination (Count III)

Mr. Charon next alleges that the Defendants violated the DCHRA by wrongfully terminating him because of his disability. Compl. ¶¶ 55–64. To adequately plead such a claim, a plaintiff must allege (1) that he belongs to a protected class, (2) that he suffered an adverse

employment action, and (3) a causal connection exists between his protected characteristic and the adverse employment action. *Baloch*, 550 F.3d at 1196.

Mr. Charon easily satisfies elements one and two. He is a member of a protected class. Compl. ¶¶ 9, 17, 19, 60. And termination is an "obvious" "adverse employment action." *Douglas v. Donovan*, 559 F.3d 549, 554 (D.C. Cir. 2009). Compl. ¶¶ 29, 30. Mr. Charon's claim comes up short, however, on the element of causation.

According to Mr. Charon, the Court can reasonably infer that he was terminated *because* of his disability because: (1) he was subject to hostility from Ms. Zimmerman following the fall that caused his physical disability; and (2) "there was no legitimate business reason for his termination." Pl.'s Opp'n at 9; *see also* Compl. ¶¶ 23–24, 61. The latter contention rests primarily on two allegations. First, Mr. Charon was "doing his work at a satisfactory level" at the time he was terminated. Compl. ¶ 61. And second, the Operations Manager position was not eliminated at a "sister" property that was subject to the same management restructuring that purportedly necessitated Mr. Charon's termination. Compl. ¶¶ 30, 62.

In support of his causation argument, Mr. Charon relies on *Jackson v. Gallaudet University*, 169 F. Supp. 3d 1 (D.D.C. 2016). There, the plaintiff alleged that she had been unlawfully terminated from her position as a bus monitor because of her "Jamaican national origin." *Id.* at 2-3, 5. Her supervisor, who "made or had significant influence on the decision to terminate" her employment, had "made numerous anti-Jamaican remarks," "often with co-workers and students present." *Id.* at 2, 5. These included questions like "'Why are you here? We don't understand foreigners' and 'Why are you foreigners trying to be promoted above Americans?'" *Id.* at 2. The court found that these allegations adequately established a link between the plaintiff's "membership in a protected class" and "her termination." *Id.* at 5–6.

9

Here, Mr. Charon's allegations regarding Ms. Zimmerman pale by comparison. Unlike the supervisor in *Jackson*, Ms. Zimmerman is not alleged to have made any comments that were expressly anti-disability. 169 F. Supp. 3d at 2. And while Mr. Charon's allegations do suggest Ms. Zimmerman had some authority related to hiring and firing—or at least threatened to use such power against others, *see* Compl. ¶¶ 26–28—there is no allegation that she "made or had significant influence on the decision to terminate" Mr. Charon's employment. *Jackson*, 169 F. Supp. 3d at 5. Even giving Mr. Charon the "benefit of all inferences that can be derived from the facts alleged," *Donelson*, 82 F. Supp. 3d at 370, these allegations are simply too threadbare to suggest that he was terminated *because* of his disability. *See Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 102–04 (D.D.C. 2021) (plaintiff failed to state race discrimination claim where there was "no suggestion" the defendant accused of animus had "any control" over the alleged adverse employment action—*i.e.*, denying the plaintiff's requests to "bring her salary comparable" to a counterpart of a different race). Such an inference is especially strained when members of the same management team that decided to terminate Mr. Charon had presumably been involved in granting his request for a disability accommodation only weeks earlier without issue. Compl. ¶ 19.

Mr. Charon's allegations regarding the lack of a legitimate business reason for his termination are similarly deficient. A plaintiff may demonstrate causation by showing that he was "treated differently from similarly situated employees who are not part of the protected class." *George*, 407 F.3d at 412. But Mr. Charon does not adequately allege that the Operations Manager at the Graham Georgetown's "sister" property was similarly situated. He alleges nothing, for example, about whether that individual had a disability, or whether they had similar qualifications, work experience, and seniority (or lack thereof). *Mitchell v. Garland*, No. 23-CV-2412, 2024 WL 3251217, at *4 (D.D.C. July 1, 2024) (to support "an inference of discrimination . . . it is essential

that the similarly situated comparator not share the plaintiff's protected trait"); *cf. Doe #1*, 554 F. Supp. 3d at 103 (plaintiff failed to allege "counterpart" was similarly situated where she offered no allegations about the counterpart's "credentials," "work experience," or other attributes). Moreover, the fact that two of Mr. Charon's colleagues were terminated, despite having no apparent disabilities, undercuts an inference that he was specifically targeted because of his protected status. Compl. ¶ 31.

### C.   Retaliation (Count IV)

Lastly, Mr. Charon alleges that the Defendants retaliated against him. Compl. ¶¶ 65–74. The DCHRA makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed . . . any right granted or protected under" the Act. D.C. Code § 2-1402.61(a). To state a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in statutorily protected activity, (2) the employer took an adverse employment action against him, and (3) a causal connection existed between the two." *Gibson v. Kirkland & Ellis, LLP*, No. 23-CV-3371, 2025 WL 958241, at *4 (D.D.C. Mar. 31, 2025) (collecting cases); *see also District of Columbia v. Bryant*, 307 A.3d 443, 452 (D.C. 2024), *reh'g denied* (Sept. 27, 2024) (plaintiff could prevail in DCHRA retaliation claim by proving that the employer's actions were "motivated in substantial part" by retaliatory reasons) (cleaned up). At the motion to dismiss stage, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *see also Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) ("[I]n order to survive a motion to dismiss, all the complaint has to say is [that] the [defendant] retaliated against me because I engaged in protected activity." (cleaned up)).

11

Here, Mr. Charon has adequately stated a retaliation claim. The first two elements are straightforward. Mr. Charon engaged in protected activity by complaining about Mr. Dolue's email to Mr. Kidney, and by seeking an accommodation and workers compensation benefits following his fall. Compl. ¶¶ 69–70.[2] And his termination was obviously an adverse employment action. *Douglas*, 559 F.3d at 554. The only real point of contention between the Parties is causation.

Accepting Ms. Charon's allegations as true, the Court finds that they support inferring that the hotel's management terminated him *because* he had engaged in protected activity. Mr. Charon alleges that he was terminated a month after engaging in protected activity, which is itself enough to establish causation at this stage. *See, e.g.*, *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (temporal proximity can "support an inference of causation . . . where the two events are 'very close' in time" (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). But Mr. Charon relies on more than temporal proximity. Most notably, he alleges that the Graham Georgetown's owner "laughed" at his report regarding Mr. Dolue's email and took no corrective action. Compl. ¶ 40. He also alleges that the hotel's general counsel reacted with hostility to Mr. Charon's efforts to document his fall, threatened coercive actions against co-workers who helped Mr. Charon, and stated: "There will be reprisals for everyone involved[.]" Compl. ¶¶ 23–28. And, finally, he alleges that the co-workers who assisted him were also terminated. Compl. ¶ 31. Viewed together, these allegations support an inference that the Defendants did not like that Mr. Charon had engaged in protected activity and terminated him as a result.

---

[2] *See also* Defs.' Mot. Dismiss at 10 n.8, ECF No. 7-1 ("For the purpose of this Motion, Defendants do not contest that Mr. Charon engaged in protected activity.").

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion to dismiss as to Counts I, II, and III, but denies the Defendants' motion as to Count IV.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   September 8, 2025